HILL
*v.*
CHATFIELD.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## RATHBONE et al. *v.* NEAL et al.

4 563;
51 1794

Where a vessel, in consequence of unseaworthiness existing at the commencement of the voyage, and not from any perils of the sea or accident, is compelled to put into an intermediate port for repairs, where she is kept a much longer time than necessary to prepare her for the completion of her voyage, the owners will be responsible to the freighters for any damage resulting from the delay in the delivery of freight, occasioned by her unseaworthiness and unnecessary detention.

Where a vessel is compelled to put into an intermediate port for repairs, it is the duty of the master to cause the repairs to be made without any unnecessary delay, in order to prosecute his voyage to the port of destination. If he wait for orders from the owners of the vessel, the latter will be responsible to the freighters for any damage resulting from the delay.

Whatever care and diligence may have been shown in preparing a vessel for her voyage, and in rendering her staunch and strong, yet if, in fact, she was not so, the owners will be responsible for any damage resulting therefrom to the owners of freight, when not shown to have been caused by stress of weather or accident.

Where a vessel is compelled to put into an intermediate port for repairs, the burden of proving seaworthiness at the commencement of the voyage is on the owners of the vessel.

The value of merchandize at the port of destination is the basis of valuation in contracts of affreightment.

A carrier is bound not only to transport goods entrusted to him safely, but to do so within a reasonable time; and he is bound to account for their value such as it may be at the expiration of that time. Neither the acceptance of the goods, nor the subsequent disposal of them, by private sale, by the owner, will be a bar to the action. The ascertaining of the damage sustained by the owner is a matter resting on the ordinary rules of evidence.

A court has no authority to make any allowance as a fee to an expert, to be taxed among the costs of the suit. Const. art. 71.

APPEAL from the Fourth District Court of New Orleans, *Strawbridge*, J. *Benjamin* and *Micou*, for the plaintiffs. *Josephs*, for the appellants. The judgment of the court (*Rost*, J. absent,) was pronounced by

EUSTIS, C. J. The plaintiffs shipped on board the ship London, for New Orleans, fifteen cases of merchandize, consisting chiefly of calicoes and prints. The bills of lading are in the usual form, and bear date the 7th of February, 1846. The ship sailed on her voyage on the 14th of that month at eleven o'clock, A.M., and arrived in New Orleans on the 22d of August, where she discharged her cargo. The cases were received by the plaintiffs, who instituted the present action against the owners of the ship for the unnecessary detention and delay in the delivery of their merchandize. They recovered judgment for the sum of $3622 74, with interest from the date of the judgment, and the defendants have appealed.

By the log-book, at nine o'clock P.M. on the 15th February, the day after the ship sailed, she is described as *leaking badly*. No mention is made of her

leaking, in the next day's register; but the day following the same entry is made, and is continued until the 27th. On that day the crew exhausted by the fatigue of pumping, insisted on making a port, as the leak continued to increase. The ship put into Nassau, on the 1st of March; her cargo was discharged and put in stores; she remained in that port until the 14th of July, when she sailed for New Orleans.

The grounds on which the plaintiffs rely, and on which the case has been argued before us are: 1st. That the ship was unseaworthy when she left Boston, and that her putting into an intermediate port was only a consequence of her unseaworthiness. 2d. That she was detained at Nassau a much longer time than was required to make the repairs necessary for the completion of her voyage. These grounds appear to have been fairly put at issue in the petition and answer; and the defendants adduced evidence in order to establish the sound condition of the ship at the time of her sailing from Boston, and to explain and justify the apparently extraordinary delay which occurred at Nassau. The district judge, before whom the case was tried, was of opinion that the ship was not seaworthy at the commencement of the voyage, and decided it for the plaintiffs on that ground.

The ship had received extensive repairs before the present voyage. She was at the time nineteen years old, having been built in Medford in 1827. She was rated by the inspector of insurance offices of Boston as A no. 3. We infer from the testimony that the repairs were adequate and thorough, in the judgment of the ship-wrights and of the inspector. The district judge came to the conclusion, from an examination of the log-book, that there was no weather sufficiently bad to account for the leak, which was discovered the day after the ship left her port, or its gradual increase, which did not indicate any sudden injury. Called upon to review this opinion, as a matter of fact, we concur with the district judge, considering that the weather was not at all unusual for the season of the year in those latitudes, and not sufficient to account for the condition of the ship as it is represented to be on her arrival at Nassau. And we think this conclusion is supported by other facts which appear in the case. When testifying under a commission, to the repairs of the ship previous to her voyage, at East Boston, *Snelling*, the master ship-wright and caulker, says, after giving the details: " She was repaired thoroughly, and I do not know where or how they could have spent any more money on her in the repairs, or how they could have been better done." Again, " I do not know to what cause to attribute her leaking unless to the rough weather, because she was repaired well; there was nothing that could strain that I know of." The testimony of the inspector is to the same effect.

Now the defendants in their answer charge that the damage to the ship from continued gales and storms was such as to require her to be *thoroughly repaired* at Nassau, and two of the witnesses examined at Nassau, state that she could not have continued her voyage to New Orleans, with safety to the cargo, without the repairs which were put upon her. At Nassau her bottom was overhauled and refastened where required, recaulked from keel to gunwail; sheathed with felt and wood, and the sheathing caulked and coated. And the defendants also allege that, *after regular survey and legal examination at Nassau*, it was found necessary that the ship should be thoroughly repaired &c. in order to enable her to continue her voyage. No survey, nor any thing in the shape of a legal examination, has been offered in evidence, no local or definite injury to

the ship is mentioned, nor is her condition explained except by the testimony, in general terms, that she arrived in distress in a very leaky condition, and that the repairs put upon her were necessary; and the necessity of the repairs the defendants assume, and found upon it the excuse for the long delay. But as we have seen, there is no adequate cause which is made apparent which accounts for the condition of the ship which required her to be thoroughy repaired at Nassau, after having been, in less than two months previously, thoroughly repaired in Boston. Nor is the season of the year unimportant in considering this subject. In the latter part of spring and the beginning of summer the weather is mild, and in the voyage from Nassau to New Orleans there is little risk of meeting with storms.

A circumstance which is worthy of note is the sheathing with felt and wood, which was put on in Nassau. Her bottom appears to have been carefully examined in Boston, and there was not a worm hole to be seen in it. She had been stripped of her old sheathing and copper, but was neither resheathed or coppered again. She went to sea on what is called a single bottom, without sheathing of wood or copper. Still we find at Nassau, she could not pursue her voyage to this port in safety to the cargo without being sheathed as before described, for which no reason has been assigned in the evidence; and the necessity, if any existed, for the sheathing, must therefore rest upon the condition of the ship as before stated.

The defendants, as they were bound to do, have taken upon themselves to justify the delay in the port of Nassau, and we think have not been successful in establishing any cause for it, which, under the law, released them from the responsibility attached to carriers of goods for hire. The testimony of one of the witnesses, *Mr. Meadows*, which is especially relied upon by the defendants, is in such strict concurrence with what appears to us to be the obvious truth of the case, that without going into details on these questions of fact, we give the summary which the witness himself makes at the close of his examination: "Considering the season, the age of the ship, and the nature and value of the cargo," the witness was of opinion, that the whole of the repairs put upon the ship were necessary to render her perfectly seaworthy, and to ensure the safety of her cargo. Had they been with promptitude begun and energetically performed, six weeks would have been ample time for their completion; but they were not commenced until orders were received from the owners of the ship, and the awaiting the arrival of orders consumed the greater part of the time during which the ship lay in this port." The commencement of the repairs had been deferred by the captain, until he had communicated with the owners on the subject, who eventually sent out a vessel with supplies of materials, and orders to proceed.

Upon the hypothesis assumed by the defence, it was the duty of the captain to have caused the repairs to have been made, without any unnecessary delay, in order to have prosecuted his voyage to the port of destination, and his powers were ample to that effect. It is not pretended that there was any lack of means to meet the expenses of the repairs; and, if money could not be raised on the credit of the captain and owners, as the ship was in a foreign port, the master had authority to hypothecate her for that purpose. Why then did he put off making the repairs until he received orders from his owners, in relation to a matter of duty, upon which he was bound to act upon his own responsibility; and what valid excuse was there for this delay?

RATHBONE
v.
NEAL.

We find also in evidence a document, bearing the signature of *Joseph Balch,* President of the Merchant's Insurance Company, and of three other Presidents of Insurance Companies, which reads thus:

"We the undersigned interested in the cargo of the ship London of Salem, *J. E. Lorett* master, as underwriters, or *as owner or owners of any part of the same* or otherwise, do hereby give our full assent to said ship being repaired at Nassau, New Providence, where she put in from stress of weather, in such manner as in the discretion of the master may be deemed proper, and then again take her cargo on board and proceed on her voyage to New Orleans. And we do hereby release him and the owners of said ship from any responsibility which might in such case arise from this course being taken as to her repairs, without this their especial consent." Dated *Boston, April* 7, 1846.

In reference to these circumstances which we have just stated we deem it sufficient to state that they are not explained, and that it is incumbent on the defendants to explain them, and that we think they all point to the conclusion, that the putting into the port of Nassau, and the delay there, were not caused by the perils of the sea, but by the condition of the ship, for which we have an obvious and adequate cause, to wit, her age and the recent necessity for her repairs at Boston. In such a case it is not denied that the defendants would be liable. Whatever care and diligence may have been shown in preparing the vessel for the voyage and in rendering her staunch and strong, yet if, in point of fact, she was not so, they are still responsible, and when it satisfactorily appears that no stress of weather or *accident* can have happened to have occasioned the injury, it is but a reasonable inference that the ship was defective at the commencement of the voyage and not seaworthy. Phillips on Insurance, p. 116.

In the case of *Snethen* v. *Memphis Insurance Company,* 3 Annual Reports, p. 474, which was an action on a policy of insurance on merchandize shipped on board a barge from St. Louis to New Orleans, the authorities cited by counsel were examined, and we came to the conclusion that the presumption of unseaworthiness in such cases necessarily arose; and though not conclusive, and liable to be rebutted by evidence, it threw the burthen of proof on the insured to establish the fact of seaworthiness. In that case, as well as in the case of *Talbot* v. *Commercial Insurance Company,* 2 Johnson, 129, the court considered the question as turning upon the age of the vessel, there being no other cause to which the injury could be justly attributed.

For these reasons, independently of the mere delay in Nassau, which, as we have stated, we do not think satisfactorily accounted for on the opposite hypothesis assumed by the defence, we concur in opinion with the district judge, on the point of seaworthiness of the ship at the commencement of the voyage.

With regard to the amount of damages the district judge based his judgment on a report of exports. Their calculations were founded upon the value of the goods at the port of destination, in which profits to the extent of fifteen per cent on the invoices were included.

It is contended that as there was neither bad faith nor fraud on the part of the defendants, their obligations were not affected by the fluctuations of the market, and that they are only liable for such damages as entered into the contemplation of the parties at the time of the contract.

We consider the rule as settled which makes the value of merchandize at the port of destination the basis of valuation in contracts of affreightment. In the present case the operation of this rule is most just. In every port of the United

States the seasons of business in this vast mart are perfectly well known, and that the close of Summer and the beginning of Autumn are unfavorable times for the sale of goods here, no ship master can be ignorant. The carrier undertakes to transport the goods not only in good safety but within a reasonable time, and he is bound to account for the value at the expiration of that time. It is as much a part of his contract as to deliver them in good condition; and in commercial adventures time is one of the elements upon which they are undertaken and controls their result. Nor do we think the plaintiffs have lost their rights to recover from the defendants for the delay in the delivery of the goods in consequence of having received them and disposed of a portion of them at private sale. These facts may be considered in mitigation of damages to a certain extent, but the cause of action having accrued by the delay, the carrier is obliged to make good the loss resulting from his neglect, and the acceptance of the goods, it is well settled, is no bar to the action. The ascertainment of the loss is a matter resting upon the ordinary rules of evidence. *Bowman* v. *Teal*, 23 Wendell's Reports, 306. We find no reason for diminishing the amount of damages allowed by the judgment.

The district judge referred the invoices, account-sales, &c., with the testimony which was pertinent, to an expert to examine and report on the several items, and ordered the sum of one hundred dollars to be taxed in the costs of the suit as a fee to the person appointed. This allowance is in contravention of the article 71 of the Constitution, which prohibits any allowance by a court, by way of fee or compensation, in any suit or proceeeings, except for the payment of such fees for ministerial officers as may be established by law. The party to whom the allowance has been made is not within the exception; the allowance is consequently within the prohibition.

The judgment of the district court is therefore affirmed, with the exception of $100 to the expert, which is annulled, reserving the rights of said expert to claim his compensation for services by him rendered; the appellees paying the costs of this appeal.